## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOHN D. HAYWOOD, # B-44617,      )
       )
     Plaintiff,     )
       )
   vs.     )    **Case No. 18-cv-021-MJR**
       )
DIRECTOR IDOC,     )
KIMBERLY BUTLER,     )    18-527-JPG
DR. FINNERMAN,     )
WARDEN CONNERS,     )
WARDEN GATES,     )
DR. SHEIRERS,     )
C/O MAUE,     )
SERG. WELLS,     )
LT. BAYLOR,     )
WARDEN LAMB,     )
C/O TUBBS,     )
C/O ADAMS,     )
WARDEN GOINGS,     )
MRS. CUNNINGHAM,     )
C/O PREDI,     )
DR. SHEF,     )
NURSE COLLINS,     )
NURSE TAMMY,     )
WARDEN DONAHUE,     )
MEDICAL STAFF (Robinson C.C.),     )
SHERRI LARREST,     )
MEDICAL STAFF (Big Muddy C.C.),     )
and CHANDLER ESTATO,     )
       )
     Defendants.     )

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

Plaintiff, currently incarcerated at Lawrence Correctional Center ("Lawrence"), has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He sues 21 individual Defendants and 2 groups of unknown Medical Defendants. Some of his claims date back to

1995, though most arose from 2007 through 2017. These claims involve events at 4 different prisons (Robinson Correctional Center, Menard Correctional Center, Lawrence, and Big Muddy Correctional Center). This case is now before the Court for a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A. Additionally, the Court must assess whether all of Plaintiff's claims may proceed in the same action.

Under § 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). The Court must dismiss any portion of the Complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief. 28 U.S.C. § 1915A(b).

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that "no reasonable person could suppose to have any merit." *Lee v. Clinton*, 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id.* at 557. Conversely, a complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept factual allegations as true, *see Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011), some factual allegations may be so sketchy or implausible that they fail to provide sufficient notice of a plaintiff's claim. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, Courts "should not accept as adequate

abstract recitations of the elements of a cause of action or conclusory legal statements." *Id.* At the same time, however, the factual allegations of a *pro se* complaint are to be liberally construed. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

Applying these standards, the Court finds that some of Plaintiff's claims survive threshold review under § 1915A. Further, it is clear that several of the claims are not properly joined in the same action. Those claims shall be severed into new cases, where they shall undergo the required § 1915A review.

## The Complaint

Plaintiff begins his statement of claim by relating that while he was incarcerated at Robinson in 1995, a large tumor developed on his left foot. (Doc. 1, p. 5). Unidentified health care providers dismissed the condition and denied treatment for the tumor. Also at Robinson in 1995, Plaintiff "blew his back out" while powerlifting, which left him paralyzed from the waist down. *Id.* "Healthcare" said he was faking and had him put in segregation, where he had to crawl across the floor to get his meals. *Id.*

After 2 weeks in segregation, Plaintiff was transferred to Big Muddy, where he was also refused medical treatment for his foot and back. *Id.* One year later, Plaintiff's left foot had to be partially amputated due to bone cancer. He eventually had therapy for his back injury and was able to walk with quad canes. Plaintiff was released from prison in 1998, but was reincarcerated in 2000 and again in 2006.

Plaintiff's narrative resumes with his arrival at Menard in November 2007. (Doc. 1, p. 6). He had suffered a re-injury to his back in 2006 which left him paralyzed again. In addition to the partially amputated left foot, Plaintiff had suffered a fractured "heel bell" on his left foot in

2005 and a fractured tibia in 2001. *Id.* When Plaintiff came to Menard, he had a "weight displacement brace" and a "chair back brace" for his wheelchair. *Id.* Dr. Finnerman took both braces away, and told Plaintiff that due to his maximum security classification and the fact that Menard was not an accessible facility, he (with his wheelchair) would be housed in a non-handicapped-accessible area of the Health Care Unit.

Plaintiff wrote to Warden Conder[1] seeking an emergency medical transfer to Big Muddy. Conder/Conners replied that Plaintiff must remain at Menard for 6 months before he could request a transfer. The next day, Dr. Finnerman told Plaintiff to pack his things, because "nobody goes over his head." (Doc. 1, p. 6). Finnerman took away Plaintiff's wheelchair, and sent him away from the Health Care Unit to the North One housing area. Plaintiff was forced to crawl along the floor under threat to be placed in segregation if he did not make it to North One on time, based on Finnerman's orders. A Lieutenant went to Health Care to get a wheelchair for Plaintiff, but was told that Finnerman would not allow it. The Lieutenant then obtained a cart to transport Plaintiff to North One, but when he arrived there, he was forced to crawl up the stairs to the third floor cell. Workers then put Plaintiff on a "gallery cart" to bring him to his cell. (Doc. 1, p. 7).

In December 2007, Plaintiff was moved to a first floor cell at Menard, and was placed on "Permanent Lay-in," which lasted until March 2016. Based on the lay-in status, Plaintiff did not go to yard, chow hall, gym, chapel, commissary, or the law library. He was never provided with a wheelchair for daily use, and the only time he was given a wheelchair was to go to health care visits. (Doc. 1, p. 7). He describes one incident after a blizzard in February 2008, when he was taken to Health Care in an ATV-ambulance. Dr. Finnerman yelled at Plaintiff, telling him he

---

[1] Plaintiff does not include a "Warden Conder" among the Defendants, but he does list Menard Warden Conners. (Doc. 1, p. 2). The Court assumes Plaintiff is referring to the same individual.

never had cancer. Finnerman ordered the officers not to use the ambulance to move Plaintiff. After the Sergeant responded that he would use the ambulance any time he wanted, Finnerman got rid of the ambulance 2 weeks later. (Doc. 1, p. 7).

In 2011, still at Menard, Plaintiff was moved to North One, where he contracted a bad staph infection in his toe after it was immersed in stagnant water in the shower. (Doc. 1, p. 8). He was treated with antibiotics, and then painful surgery and follow-up treatment on the toe, performed by Dr. Nawawaby (who is not named as a Defendant).

In 2012, Plaintiff was moved to "South Lowers" in a "test" of housing handicapped inmates there, near a shower and yard. (Doc. 1, p. 8). C/O Maue did not allow Plaintiff to use the shower (where he needed a shower chair) alone, because (Plaintiff believes) he did not want handicapped inmates in that unit. (Doc. 1, p. 9). Instead, Maue required Plaintiff to shower along with the other inmates. Plaintiff disliked being in the shower with 31 other naked men, so he stopped going to the shower. When another officer asked him why, Plaintiff told him. After that, Plaintiff was allowed to shower alone; he claims this "upset" Maue. *Id.*

Also in 2012, C/O Predi observed Plaintiff reading his Bible and praying on his knees at his cell bars, and told Plaintiff, "I wouldn't do that if I was you." (Doc. 1, p. 9). Plaintiff did not stop his religious practice, and 2 days later, when Predi again saw him praying, Predi ordered him to "cuff up" for disobeying a direct order. Predi took Plaintiff to segregation (in a wheelchair after another officer intervened), where he spent 2 days. (Doc. 1, p. 10). The disciplinary ticket was thrown out, but Plaintiff had to spend 52 days in the "segregation kickout" area before a space opened for him to move back to the South Lowers. He was also notified that he was given 3 months of "C-grade" on the disciplinary ticket, which was apparently a computer mistake. *Id.*

Plaintiff next complains about a May 2014 incident with C/O Maue. (Doc. 1, p. 10). Plaintiff had been moved to a cell with another inmate (Doyle) who, like Plaintiff, had a bottom bunk permit. Rather than report the problem, Doyle tried to force Plaintiff out of the cell by starting an argument and accusing Plaintiff of acting aggressive. (Doc. 1, p.11). Plaintiff states that he was not aggressive, but merely packed his property so that he could request another cell, which he explained to C/O Mrs. K (not a Defendant). Later that day, Maue and several other officers came to the cell with Doyle (who had been at work), and Maue sent Doyle into the cell to fight Plaintiff. Plaintiff swung first, Doyle ran out of the cell, and the force of Plaintiff's swing caused him to fall. Maue caught Plaintiff in a head lock, and then a choke hold that Plaintiff felt was an attempt to break his neck. (Doc. 1, p. 11). A Lieutenant arrived and ordered Maue to let Plaintiff go before he killed him. (Doc. 1, p. 12). Maue released Plaintiff but then shoved his face into the floor and put his knee on the back of Plaintiff's neck. The Lieutenant ordered Maue to get off Plaintiff; he then took Plaintiff to Health Care in a wheelchair. Plaintiff believes he suffered a broken elbow, and he could not speak for 4 days because of the injury to his neck. X-rays were not taken until 3 weeks later, and Plaintiff got no medical treatment. Plaintiff was told nothing was wrong with his elbow or neck, but he insists he can still move a piece of his elbow, and claims the x-ray report he received showed a fracture. (Doc. 1, p. 13).

Plaintiff was charged with a disciplinary infraction for the "fight" with Doyle. (Doc. 1, p. 12). On the day his ticket was to be heard, C/O Chandler (Estato)[2] told Plaintiff to get ready as he would be back to get him. Plaintiff requested a wheelchair. (Doc. 1, p. 12). Chandler never returned, however, and when Plaintiff questioned him later that day, Chandler responded that Plaintiff had "refused" to attend the hearing when he asked for a wheelchair. (Doc. 1, p. 13).

---

[2] Plaintiff refers to this Defendant as "C/O Chandler" in the body of the Complaint, and lists his full name of "C/O Chandler Estato" in the list of Defendants. (Doc. 1, p. 2).

Plaintiff was found guilty of a staff assault for the incident with Maue. He was moved from the Health Care Unit (where he had spent the previous 3 weeks) to segregation, thinking he had been given a 30-day segregation punishment. However, he spoke to Warden Butler when she visited the wing, and she informed him that his punishment was for 90 days in segregation. Plaintiff disputes that the incident amounted to a staff assault, because Maue entered his cell as he was falling, so that Plaintiff fell onto him. (Doc. 1, p. 14).

Between the above 2014 incident and 2016, Plaintiff was told that he could not be housed on South Lowers because Maue and Doyle felt unsafe with him. Plaintiff was then shuffled between several non-handicap-accessible housing areas until he was transferred to Lawrence in 2016. (Doc. 1, p. 14). Before that transfer, Plaintiff contracted pneumonia after a flood. He was not treated for 2 weeks, until an officer finally took him to Health Care, where he was given antibiotics. (Doc. 1, p. 15).

On March 9, 2016, Plaintiff was told he was being transferred. (Doc. 1, p. 15). His request for a wheelchair was initially refused, but eventually an officer took him in a wheelchair to the chapel, where the outgoing inmates were strip searched. (Doc. 1, p. 16). However, the wheelchair was then taken away, forcing Plaintiff to crawl on the floor until he fell and some fellow inmates carried him outside where the bus was waiting. An officer threatened those inmates with segregation, so they put Plaintiff down, and he crawled across the pavement to the bus, where the driver helped him to board it. Plaintiff had to change buses at Lincoln Correctional Center, where he was given a wheelchair at first. However, Lt. Beyler/Baylor[3] would not allow anybody to help Plaintiff board the Lawrence bus, and laughed while Plaintiff crawled through the mud and rain to get on. (Doc. 1, p. 17).

---

[3] Plaintiff refers to this Defendant as Beyler in the statement of claim, but his list of parties identifies him as Lt. Baylor. (Doc. 1, p. 2).

Upon his arrival at Lawrence, Plaintiff was given a wheelchair to get to his cell. He was having trouble breathing because of the pneumonia. After some delay, Plaintiff was taken to Health Care where a nurse gave him a breathing treatment and said he would need to see the doctor. Plaintiff was moved to another cell and the wheelchair was taken away. (Doc. 1, p. 18). For at least a week, while the doctor (Dr. Coe, who is not a Defendant) was on vacation, Plaintiff was forced to crawl from the bed to the door to get his medications, water, and food.

After Dr. Coe returned, he issued Plaintiff permits for a low bunk, low gallery, two mattresses, ice, daily cleaning of his cell, and a wheelchair. (Doc. 1, p. 19).

In July 2016, C/O Tubbs began working on Plaintiff's wing. Tubbs refused to give Plaintiff ice, despite the fact Plaintiff had the medical permit and all other inmates received ice. Tubbs stopped Plaintiff and his attendant from using cleaning supplies to clean Plaintiff's cell, because the permit did not say "cleaning supplies." (Doc. 1, p. 19). Plaintiff had Dr. Coe change the permit, but then Tubbs said it did not include bleach or pink soap. Finally Tubbs asked to see all Plaintiff's permits. When Plaintiff handed them over, Tubbs wrote on them that they were canceled. Plaintiff wrote a series of 25 grievances against Tubbs. Later on, Tubbs stopped Plaintiff and his attendant from cleaning the shower chair, saying he would do it. Tubbs began "shaking down" Plaintiff's attendant, and some of his items disappeared, so the attendant quit. Plaintiff reported the problems with Tubbs to his counselor, a Lieutenant, a Major, and Wardens. Warden Goings told Plaintiff to stop writing grievances because he was aware of the problems with Tubbs. (Doc. 1, pp. 19-20). However, Goings did not respond for 4 months.

Goings eventually told Plaintiff that he had a "permit problem" – meaning he had too many of them. (Doc. 1, p. 20). Goings called Mrs. Cunningham (Health Care Administrator) and told her to take Plaintiff's medical permits, and set him an appointment with the doctor.

Two days later, Plaintiff saw Dr. Shev[4] (or Dr. Shef), who said that because of the medical permits, Plaintiff would be made a permanent part of Health Care and would "live in the back." (Doc. 1, p. 20). Plaintiff protested, pointing out that his permits had been issued by the IDOC Medical Director, Dr. Shev's/Shef's boss. Dr. Shev/Shef had Plaintiff removed and taken back to his cell. Plaintiff wrote a grievance against Warden Goings.

Tubbs continued to harass Plaintiff, refusing to honor any of his permits. Tubbs would shake down Plaintiff's cell and discard his purchased commissary items for allegedly being in the wrong place or in the wrong package. Plaintiff complained to the counselor, saying he was tired, he had just lost his mother, and just found out he was terminally ill,[5] and since he was dying, "who can I take with me?" (Doc. 1, p. 21). Plaintiff was moved to 4 House, away from Tubbs, where he still remained as of the date he filed this action.

In February 2017, Plaintiff complained and filed a grievance over a set of headphones which he sent to be repaired, and for which he was charged a repair fee and postage, but which were never returned. (Doc. 1, p. 21). He was at one point offered a replacement set, but was later told there would be no replacement, and he was merely reimbursed for his postage cost. (Doc. 1, p. 22).

On November 24, 2017, Plaintiff saw Dr. Shev/Shef (who was not his regular doctor). Dr. Shev/Shef took away Plaintiff's high blood pressure medication that Dr. Armid had just prescribed, and increased Plaintiff's heart medication. (Doc. 1, p. 23). Plaintiff complained, and mistakenly said he was out of Lasix, when he was actually out of potassium. Dr. Shev/Shef told

---

[4] To the extent the Court can decipher Plaintiff's handwriting, it appears that he refers to this Defendant as "Dr. Shev" in the body of the Complaint. However, he includes only "Dr. Shef" in the list of parties. (Doc. 1, p. 2). The Court presumes Plaintiff is referring to the same individual.

[5] Plaintiff states that in August 2016, while he was at Lawrence, he learned from Carle Foundation Hospital that he in fact had not been suffering from pneumonia (as was diagnosed shortly before he left Menard), but had terminal pulmonary sarcoidosis and congestive heart failure. (Doc. 1, p. 15).

Nurse Collins to look into the matter, so she had Plaintiff's cell shaken down. Various medications were found there and Nurse Collins kept all but Plaintiff's antibiotics. (Doc. 1, p. 23). The fact that Plaintiff was out of potassium was never discovered.

On the evening of November 24, 2017, the med line nurse gave Plaintiff the higher dose of heart medication, but no blood pressure medication or potassium. (Doc. 1, p. 24). Plaintiff questioned the heart medication dosage, but was told to take it as Dr. Shev/Shef had prescribed. During the night, Plaintiff had to urinate every 30 minutes, and by 8:00 a.m. he was dehydrated and "fell out." *Id.* Plaintiff was able to hear, but not speak, and heard his cellmate tell officers that Plaintiff had gone to med line at 5:00 a.m. but he didn't know if he took anything.

Plaintiff was taken to Health Care, where Nurse Tammy decided that he must have overdosed, based on the cellmate's alleged statement that Plaintiff had hidden pills and taken a handful that morning. Plaintiff's cell was shaken down again and several medications were found there, which he claims he was authorized to have. Plaintiff kept asking for water, but Nurse Tammy refused to let him have a drink until he told her what pills he had taken. After 2 hours, Plaintiff was moved to an observation room, and he then drank a large amount of water. (Doc. 1, pp. 24-25). He got up to urinate but fell and apparently hit his head, then had to vomit when he came to. An ambulance was called, and Plaintiff was taken to an outside facility, where several hours later, blood tests showed no drugs in his system, but a dangerously low potassium level. Plaintiff was treated and returned to Lawrence about 8 hours later. (Doc. 1, pp. 25-26).

Plaintiff was found guilty of a conduct violation for having the pills in his cell, and punished with 3 months of C-grade, 3 months of B-grade, and 6 months of no contact with his family, even though he is terminally ill. Plaintiff claims his blood pressure is still abnormally high, yet his blood pressure medications have never been restored. (Doc. 1, p. 26).

Plaintiff seeks compensatory and punitive damages. (Doc. 1, p. 27).

## Merits Review Pursuant to 28 U.S.C. § 1915A

Based on the allegations of the Complaint, the Court finds it convenient to divide the *pro se* action into the following counts. The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. The designation of these counts does not constitute an opinion as to their merit. Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice.[6]

> **Count 1:** Eighth Amendment deliberate indifference claims against Robinson Medical Staff, for delaying and denying treatment for Plaintiff's foot tumor and back injury in 1995;
>
> **Count 2:** Eighth Amendment deliberate indifference claims against Big Muddy Medical Staff, for delaying and denying treatment for Plaintiff's foot tumor and back injury in approximately 1995-1998;
>
> **Count 3:** Eighth Amendment deliberate indifference claim against Dr. Finnerman, for taking away Plaintiff's braces and wheelchair at Menard in November 2007;
>
> **Count 4:** First Amendment retaliation claim against Dr. Finnerman, for taking away Plaintiff's wheelchair after Plaintiff complained to the Warden about Finnerman taking his braces upon his arrival at Menard in November 2007;
>
> **Count 5:** Claim against Maue for requiring Plaintiff to shower together with other inmates in his housing area in 2012;
>
> **Count 6:** First Amendment claim against Predi for interfering with Plaintiff's religious practice and issuing him a disciplinary ticket for praying in his cell at Menard in 2012;
>
> **Count 7:** Eighth Amendment claim against Maue for using excessive force

---

[6] Plaintiff failed to associate any Defendant with several potential claims, thus they are not included in the enumerated Counts. These include: Plaintiff's staff infection in his toe contracted in 2011 at Menard; the alleged non-treatment of his 2014 injuries inflicted by Maue; the delayed treatment of his pneumonia at Menard in 2016; the denial of a wheelchair for 1-2 weeks after his 2016 arrival at Lawrence; and the February 2017 loss of his headphones after he sent them for repair. These claims and any others not mentioned herein are dismissed without prejudice.

against Plaintiff at Menard in May 2014;

**Count 8:** Fourteenth Amendment due process claim against Chandler Estato for failing to take Plaintiff to his disciplinary hearing on the staff assault charge in May 2014, and against Butler and Maue in connection with the disciplinary action;

**Count 9:** Eighth Amendment claim against Maue for preventing Plaintiff from being housed in the handicap-accessible housing area on South Lowers from 2014-2016;

**Count 10:** Eighth Amendment claim against Beyler/Baylor for denying Plaintiff a wheelchair or assistance to board the transfer bus to Lawrence on March 9, 2016;

**Count 11:** Eighth Amendment deliberate indifference claim against Tubbs for refusing to honor Plaintiff's medical permits, and against Tubbs, Goings, and Cunningham for confiscating and/or cancelling the medical permits at Lawrence in 2016;

**Count 12:** First Amendment retaliation claim against Tubbs, for shaking down Plaintiff's cell, destroying his commissary property, and refusing to honor Plaintiff's medical permits after Plaintiff filed grievances against Tubbs in 2016 at Lawrence;

**Count 13:** Eighth Amendment deliberate indifference claims against Dr. Shev/Shef, Nurse Collins, and Nurse Tammy for altering his medications, confiscating his medications, and/or failing to treat him for the effects of his medication changes and his high blood pressure symptoms, on and after November 24, 2017, at Lawrence.

### Dismissal of Defendants not Associated with any Claims

Initially, the Court notes that Plaintiff fails to mention several of the Defendants in the body of the Complaint: Menard Warden Gates, Dr. Sheirers, Serg. Wells, Lawrence Warden Lamb, C/O Adams, Robinson Warden Donahue, and Big Muddy Administrator Sherri Larrest. Plaintiffs are required to associate specific defendants with specific claims, so that defendants are put on notice of the claims brought against them and so they can properly answer the complaint. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); FED. R. CIV. P. 8(a)(2). Where a plaintiff has not included a defendant in his statement of the claim, the defendant cannot be said

to be adequately put on notice of which claims in the complaint, if any, are directed against him. Furthermore, merely invoking the name of a potential defendant is not sufficient to state a claim against that individual. *See Collins v. Kibort*, 143 F.3d 331, 334 (7th Cir. 1998). And in the case of those defendants in supervisory positions, the doctrine of *respondeat superior* is not applicable to § 1983 actions. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (citations omitted). Thus, wardens and administrators cannot be held liable for the actions of employees under their supervision. Only a defendant who was personally responsible for the deprivation of a constitutional right may be held liable in a civil rights action.

Because Defendants Gates, Sheirers, Wells, Lamb, Adams, Donahue, and Larrest are not mentioned in Plaintiff's factual allegations, they will be dismissed from this action without prejudice.

Similarly, Plaintiff never indicates his grounds for including the IDOC Director as a Defendant, other than to state that his claim against the Director arose "for a part of the Complaint March 2016 till present day!" (Doc. 1, p. 1). This statement suggests that Plaintiff may be seeking to hold the current Director liable for the actions of his subordinate employees, which is not permitted in a civil rights claim. *See Sanville*, 266 F.3d at 740. Plaintiff never articulates any intention to bring a claim against the Director in his official capacity (such as under the Americans with Disabilities Act or the Rehabilitation Act), thus the Court shall not address that matter.

Plaintiff mentions former IDOC Director Godinez once, on p. 13 of the Complaint. In that section, Plaintiff states that Butler informed him he had been punished with 90 days in segregation for the staff assault involving Maue in 2014 (see Count 8). He then notes parenthetically that Director Godinez had told Butler to transfer him to "Medical Institution Big

Muddy." (Doc. 1, p. 13). This brief factual statement does not suggest any viable constitutional claim against Godinez. For these reasons, Defendant "Director IDOC" shall also be dismissed without prejudice from the action.

**Statute of Limitations**

It appears from the face of Plaintiff's Complaint that some of his older claims are barred due to the passage of time. Typically, affirmative defenses such as filing after the statute of limitations and failure to exhaust administrative remedies are litigated by the parties after service, *see Jones v. Bock*, 549 U.S. 199, 212 (2007). However, a Court may invoke these defenses on § 1915A review when the availability of the defense is apparent on the face of the Complaint. *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002); *Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir. 1992).

In a § 1983 civil rights action, Federal law relies on the State in which the action arose for the applicable statute of limitations, by using that State's personal-injury statute. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). Claims brought in Illinois under 42 U.S.C. § 1983 are subject to the two-year statute of limitations applicable to personal injury claims. 735 ILL. COMP. STAT. § 5/13-202; *see also Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993); *Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir. 1992).

Federal law, however, governs the accrual of such claims. *Kelly*, 4 F.3d at 511. A § 1983 claim accrues when "a plaintiff knows or should know that his or her constitutional rights have been violated." *Id.* In the case of a claim for deliberate indifference for the failure to treat a medical condition, the claim accrues as of the date of the last injury. *Devbrow v. Kalu*, 705 F.3d 765, 770 (7th Cir. 2013) (inmate's claim for deliberate indifference against officials who failed to timely diagnose his cancer accrued when he learned of his cancer diagnosis) (discussing

*Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001)).

In Plaintiff's case, Counts 1 and 2 claim that officials at Robinson and Big Muddy denied and delayed treatment of his foot tumor and back injury, both of which occurred in 1995. He states that he was diagnosed with bone cancer in the foot and underwent a partial amputation in 1996. Plaintiff's claim for deliberate indifference to the foot condition thus accrued in 1996, when he was diagnosed with cancer and obtained treatment. Similarly, Plaintiff's claim for non-treatment of his back injury accrued, at the latest, when he was released from prison in 1998 (assuming that treatment was still being denied at that time). Accrual of that claim arguably was earlier, at the time when he began to receive physical therapy.

Plaintiff's § 1983 claims in Counts 1 and 2 for deliberate indifference to his foot tumor thus should have been filed within 2 years of the 1996 foot operation. The claim for non-treatment of Plaintiff's back injury should have been filed, at the latest, within 2 years of his 1998 release. However, he did not file this action until January 2018, approximately 20 years too late. Accordingly, since the claims in Counts 1 and 2 were not filed within the 2-year statute of limitations period, these claims do not survive review under 28 U.S.C. § 1915A. Counts 1 and 2, and the collective "Medical Staff" Defendants at Robinson and Big Muddy, shall be dismissed from the action with prejudice.

Plaintiff's next set of claims (Counts 3 and 4) arose in November 2007 at Menard, when Dr. Finnerman took away Plaintiff's wheelchair and braces. These claims may also be barred by the 2-year statute of limitations, because the incidents with Dr. Finnerman occurred approximately 10 years ago. However, Plaintiff claims that he continued to be denied the regular use of a wheelchair at Menard from 2007 through 2016. As this may represent a continuing violation, it would be premature to dismiss Counts 3 or 4 based on the statute of limitations at

this stage.  Counts 3 and 4 shall be reviewed in more detail below.

Count 5 against Maue and Count 6 against Predi arose in 2012.  Maue's refusal to allow Plaintiff to shower privately was overruled by another officer, and Plaintiff's factual narrative suggests that the matter was resolved in 2012.  Similarly, there is no indication that Predi's alleged interference with Plaintiff's practice of his religion continued beyond the incident where Predi charged Plaintiff with a disciplinary infraction.  Both claims thus accrued in 2012, when Plaintiff knew or should have known that his constitutional rights may have been violated by Maue and Predi, respectively.  However, Plaintiff did not bring either claim until January 2018, more than 5 years later.  Counts 5 and 6 shall also be dismissed with prejudice based on the failure to file them within the 2-year statute of limitations.  As Predi is named only in connection with Count 6, he shall be dismissed from the action with prejudice.

### Severance of Claims & Defendants

As part of the screening process, the Court must consider whether the remaining claims and parties may properly proceed in the same joint action, in consideration of Federal Rule of Civil Procedure 20.  Under Rule 20(a)(2),[7] a "plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all." Wright, Miller, & Kane, 7 Federal Practice & Procedure Civ. 3d § 1655 (West 2017); FED. R. CIV. P. 20(a)(2).  The Seventh Circuit instructs that unrelated claims against different defendants belong in separate lawsuits, "not only to prevent the sort of morass" produced by multi-claim, multi-defendant suits "but also to ensure that prisoners pay the required filing fees" under the

---

[7] Rule 20, which governs joinder of parties in a single action, must be satisfied before the Court turns to the question of whether claims are properly joined under Rule 18.  *Intercon Research Assoc's, Ltd. v. Dresser Industries, Inc.*, 696 F.2d 53, 57 (7th Cir. 1982); Wright, Miller, & Kane, 7 Federal Practice & Procedure Civil 3d § 1655 (West 2017).

Prison Litigation Reform Act. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (citing 28 U.S.C. § 1915(b), (g)). Severance of unrelated claims is encouraged, and the Seventh Circuit has recently warned district courts not to allow inmates "to flout the rules for joining claims and defendants, *see* FED. R. CIV. P. 18, 20, or to circumvent the Prison Litigation Reform Act's fee requirements by combining multiple lawsuits into a single complaint." *Owens v. Godinez*, 860 F.3d 434, 436 (7th Cir. 2017). *See also Wheeler v. Talbot*, 695 F. App'x 151, 152 (7th Cir. 2017) (district court should have severed unrelated and improperly joined claims or dismissed one of them). Consistent with *George*, *Owens*, and *Wheeler*, improperly joined parties and/or claims shall be severed into new cases, given new case numbers, and assessed separate filing fees.

Plaintiff's remaining claims arose in 2 different prisons, Menard and Lawrence. Not only that, there are at least 2 distinct sets of claims based on separate incidents in Menard, and 3 distinct sets of claims that arose from separate transactions/occurrences involving Lawrence Defendants. Counts 3 and 4 involve Dr. Finnerman's actions in 2012. Counts 7, 8, and 9 are based on the excessive force incident with Maue in May 2014 and related events involving Chandler and Butler. Count 10 is based on Beyler's March 9, 2016, treatment of Plaintiff during his transfer to Lawrence. Counts 11 and 12 involve a series of transactions with Tubbs at Lawrence in 2016, some of which also included Goings and Cunningham. Finally, Count 13 is based on Plaintiff's allegations of medical mistreatment on and soon after November 24, 2017, by Dr. Shev/Shef, Collins, and Tammy at Lawrence.

Each of these 5 sets of claims arose from separate transactions/occurrences, and each involves a different set of Defendants. They do not share any common legal or factual questions. Under Rule 20, it would be improper for these 5 sets of claims to proceed in the same action.

Therefore, Counts 3 and 4 shall remain in the instant action, and pursuant to Rules 20 and 21, the Court shall sever the unrelated claims as follows:

> **First severed case:** Counts 7, 8, and 9 against Maue, Chandler Estato, and Butler
>
> **Second severed case:** Count 10 against Beyler/Baylor
>
> **Third severed case:** Counts 11 and 12 against Tubbs, Goings, and Cunningham
>
> **Fourth severed case:** Count 13 against Shev/Shef, Collins, and Tammy.

The claims in each severed case shall undergo the required § 1915A merits review after the new case number and judge assignment has been made. Plaintiff shall be assessed a new filing fee for each severed case.

The merits of Counts 3 and 4 shall be reviewed below.

### Count 3 – Deliberate Indifference to Medical Needs – Dr. Finnerman

In order to state a claim for deliberate indifference to a serious medical need, an inmate must show that he (1) suffered from an objectively serious medical condition; and (2) that the defendant was deliberately indifferent to a risk of serious harm from that condition. An objectively serious condition includes an ailment that significantly affects an individual's daily activities or which involves chronic and substantial pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). "Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Delaying treatment may constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (internal citations and quotations omitted). *See also Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015). However, the Eighth Amendment does not give prisoners entitlement to "demand specific care" or "the best care

possible," but only requires "reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Further, a defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation. *See Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

In Plaintiff's case, his claim that he is paralyzed from a back injury and unable to walk due to his paralysis and partially amputated foot satisfies the objective component of an Eighth Amendment claim. Further, it is apparent that Dr. Finnerman was aware of Plaintiff's physical impairments and medical needs. Nonetheless, Finnerman first took away Plaintiff's weight displacement brace and chair back brace, which had earlier been provided to him for use with his wheelchair. Finnerman's plan to house Plaintiff in the Health Care Unit appears to have been a response to Plaintiff's medical/physical needs for appropriate housing as a person who needed a wheelchair to mobilize, where there was no wheelchair-accessible housing area in Menard. Despite this knowledge of Plaintiff's condition, Finnerman took away Plaintiff's wheelchair and had him moved to a non-accessible housing area with no means to mobilize other than by crawling on the floor and staircases. These actions by Finnerman arguably amount to deliberate indifference to Plaintiff's medical needs, which subjected him to cruel and unusual punishment.

While Finnerman's removal of the wheelchair and braces occurred in 2007, according to Plaintiff, he was never again given a wheelchair during the rest of his time in Menard, which ended with his March 2016 transfer to Lawrence. The only exceptions occurred when Plaintiff was taken from his cell to see a health care provider. Even when Plaintiff was housed in the more accessible area of South Lowers between 2012 and 2014, he did not have a wheelchair; and he was placed back in non-accessible housing locations from 2014-2016, again without any

wheelchair.  It is unclear whether Plaintiff's ongoing deprivation of a wheelchair throughout 2007-2016 may be attributed to Finnerman's actions.  It may turn out that Plaintiff's claim against Finnerman is time-barred.  However, Plaintiff may be able to show that some other official(s) caused the ongoing deprivation during this time frame.  At this stage, the deliberate indifference claim against Finnerman in **Count 3** survives review under § 1915A and shall proceed.

### Count 4 – Retaliation – Dr. Finnerman

Prison officials may not retaliate against inmates for filing grievances, lawsuits, or otherwise complaining about their conditions of confinement.  *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002); *DeWalt v. Carter*, 224 F.3d 607 (7th Cir. 2000); *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996); *Cain v. Lane*, 857 F.2d 1139 (7th Cir. 1988).  The issue in a retaliation claim is whether the plaintiff experienced an adverse action that would likely deter First Amendment activity in the future, and if the First Amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009).  "A complaint states a claim for retaliation when it sets forth 'a chronology of events from which retaliation may plausibly be inferred.'"  *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000) (citation omitted).

Plaintiff alleges that Finnerman took away his wheelchair and sent him to a non-accessible housing area as soon as Finnerman learned of Plaintiff's request to be transferred to Big Muddy.  Plaintiff apparently asked for a transfer as a reaction to Finnerman's plan to house him in the Health Care Unit.  These events support a retaliation claim against Finnerman, in addition to the deliberate indifference claim in Count 3.  Finnerman's apparent retaliation

continued as he forbade other officers from using a wheelchair to transport Plaintiff to his new housing area. Additionally, Finnerman's actions in February 2008 when he castigated officers for using the ATV-ambulance to bring Plaintiff to a medical appointment, and then got rid of the ambulance, may be considered retaliation.

Plaintiff does not describe any further retaliatory acts on the part of Finnerman that took place after February 2008. If there were none, the retaliation claim in Count 4 is likely time-barred as having been filed nearly 10 years after the occurrence, and well beyond the 2-year statute of limitations. However, it is conceivable that the ongoing denial of Plaintiff's access to a wheelchair at Menard between 2008 and 2016 may be attributable to Finnerman, and could be considered retaliation on his part. Further factual development will be necessary in order to resolve this question, therefore, the retaliation claim in **Count 4** may also proceed against Finnerman at this time.

Plaintiff mentions Warden Conners/Conder briefly in connection with this claim, in that Plaintiff directed his transfer request to Conners/Conder. In response, Conners/Conder informed Plaintiff that no transfer could be considered until Plaintiff had been at Menard for 6 months. Nothing about this response suggests retaliation on the part of Conners/Conder, nor does it indicate that he was deliberately indifferent to Plaintiff's medical or physical needs. And Conners/Conder may not be held liable as a supervisor for any unconstitutional actions by a subordinate employee. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (doctrine of *respondeat superior* is not applicable to § 1983 actions). Accordingly, any claims against Conners/Conder shall be dismissed without prejudice, and Conners/Conder shall be dismissed from the action.

## Pending Motions

Plaintiff's motions for recruitment of counsel (Docs. 3 & 12) shall be referred to the United States Magistrate Judge for further consideration.

Plaintiff's motion for leave to proceed *in forma pauperis* ("IFP") (Doc. 11) is **DENIED AS MOOT**.  Plaintiff has already been granted leave to proceed IFP based on his earlier motion. (Doc. 10).

The motion (Doc. 13) for reconsideration of the order at Doc. 10 directing prisoner payment is also **DENIED**.  Plaintiff argues that he should not be required to pay any filing fees based on the fact he is disabled and his sole income consisted of Social Security and SSI benefits before he went to prison.  He attaches a letter from the Illinois Supreme Court granting him leave to proceed as a poor person in his criminal appeal.  (Doc. 13, p. 4).  This Court cannot grant Plaintiff's request.  The source of Plaintiff's income before his incarceration, and his disabled status, are not relevant to this issue.  Under the Prison Litigation Reform Act ("PLRA"), a prisoner is required to pay the full filing fee for a civil lawsuit in federal court, and he incurs this obligation to pay at the time the action is filed.  *See* 28 U.S.C. § 1915(b)(1); *Lucien v. Jockisch*, 133 F.3d 464, 467-68 (7th Cir. 1998); *Newlin v. Helman*, 123 F.3d 429, 434 (7th Cir. 1997).  The amount of each monthly installment payment is calculated based on the preceding month's income credited to Plaintiff's prison trust fund account (including all deposits to the inmate account from any source).  *See* 28 U.S.C. § 1915(b)(2).

## Disposition

**COUNTS 1, 2, 5, and 6** are **DISMISSED** with prejudice for failure to state a claim upon which relief may be granted, as they were filed well beyond the 2-year statute of limitations for civil rights claims.

Defendants **PREDI, MEDICAL STAFF (Robinson C.C.),** and **MEDICAL STAFF (Big Muddy C.C.)** are **DISMISSED** from this action with prejudice.

Defendants **DIRECTOR IDOC, CONNERS/CONDER, GATES, SHEIRERS, WELLS, LAMB, ADAMS, DONAHUE,** and **LARREST** are **DISMISSED** from this action without prejudice.

**IT IS HEREBY ORDERED** that Plaintiff's claims in **COUNTS 7, 8, 9, 10, 11, 12, and 13**, which are unrelated to the claims in **Counts 3 and 4**, are **SEVERED** into four new cases, as follows:

> **First Severed Case:** Menard claims from 2014-2016, including **Count 7** against Maue for excessive force; **Count 8** against Chandler Estato, Butler, and Maue arising from Plaintiff's disciplinary charge for staff assault; and **Count 9** against Maue for excluding Plaintiff from the handicap-accessible housing in South Lowers;

> **Second Severed Case:** **Count 10** against Beyler/Baylor for denying Plaintiff a wheelchair during the March 9, 2016, transfer to Lawrence;

> **Third Severed Case:** Lawrence claims from 2016, including **Count 11** against Tubbs, Goings, and Cunningham for disregarding and/or cancelling medical permits; and **Count 12** against Tubbs for retaliation;

> **Fourth Severed Case:** Lawrence claims from November 2017 to the present in **Count 13** against Dr. Shev/Shef, Collins, and Tammy for deliberate indifference to medical needs.

The claims in each newly severed case shall be subject to a merits review pursuant to 28 U.S.C. § 1915A after the new case number and judge assignment is made. In each new case, the Clerk is **DIRECTED** to file the following documents:

> (1)    This Memorandum and Order
> (2)    The Original Complaint (Doc. 1)
> (3)    Plaintiff's motion to proceed *in forma pauperis* and trust fund statement (Docs. 7 & 9)
> (4)    Plaintiff's motions for recruitment of counsel (Docs. 3 and 12)

Plaintiff **will be responsible for an additional $350.00 filing fee** in each new case. No

service shall be ordered on the Defendant(s) in the severed cases until the § 1915A review is completed.

**IT IS FURTHER ORDERED** that the _only claims remaining in this action are COUNT 3 and COUNT 4 against Defendant FINNERMAN_.  This case shall now be captioned as: **JOHN D. HAYWOOD, Plaintiff, vs. DR. FINNERMAN, Defendant.**

**IT IS FURTHER ORDERED** that Defendants **BUTLER, MAUE, BEYLER/BAYLOR, TUBBS, GOINGS, CUNNINGHAM, SHEV/SHEF, COLLINS, TAMMY, and CHANDLER ESTATO** are **TERMINATED** from **_this_** action with prejudice.

As to **COUNTS 3 and 4**, which remain in the instant case, the Clerk of Court shall prepare for Defendant **FINNERMAN:**  (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons).  The Clerk is **DIRECTED** to mail these forms, a copy of the complaint, and this Memorandum and Order to Defendant's place of employment as identified by Plaintiff.  If Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on Defendant, and the Court will require Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If the Defendant cannot be found at the address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address.  This information shall be used only for sending the forms as directed above or for formally effecting service.  Any documentation of the address shall be retained only by the Clerk.  Address information shall not be maintained in the court file, nor disclosed by the Clerk.

Defendant is **ORDERED** to timely file an appropriate responsive pleading to the

complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to **United States Magistrate Judge Stephen C. Williams** for further pre-trial proceedings, which shall include a determination on the pending motions for recruitment of counsel (Docs. 2 & 12).

Further, this entire matter shall be **REFERRED** to United States Magistrate Judge Williams for disposition, pursuant to Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: March 1, 2018**

s/ MICHAEL J. REAGAN
Chief Judge
United States District Court